UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| TETRA TECH CONSTRUCTION INC., | ) | |
| | ) | |
|     Plaintiff, Counterclaim | ) | |
|     Defendant, and Third-Party | ) | |
|     Plaintiff | ) | |
| | ) | |
|     v. | ) | 1:14-cv-00298-GZS |
| | ) | |
| SUMMIT NATURAL GAS OF MAINE | ) | |
| INC., | ) | |
| | ) | |
|     Defendant and Counterclaim | ) | |
|     Plaintiff | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| JM CABLE CORP AND FIBER NET INC, | ) | |
| | ) | |
|     Third Party Defendants | ) | |

**RECOMMENDED DECISION ON DEFENDANT'S MOTION TO DISMISS**

The matter is before the Court on Defendant Summit Natural Gas of Maine's Motion to Dismiss Counts IV and V of Plaintiff Tetra Tech Construction's Second Amended Complaint. (Motion to Dismiss, ECF No. 63.) Through its motion, Defendant argues that Plaintiff's claims for intentional/fraudulent misrepresentation and negligent misrepresentation are barred by the economic loss doctrine. (*Id.* at 1.) Defendant also argues that Plaintiff has not plead its fraud claim with sufficient particularity. (*Id.*)

In response to the motion, Plaintiff represents that it will voluntarily dismiss its fraud claim without prejudice with the understanding that it might reassert the claim based on the results of anticipated discovery. Plaintiff objects to the dismissal of the negligent misrepresentation claim. (Pl.'s Response in Opposition at 3, ECF No. 71.)

**Background Facts**

The following facts are drawn from Plaintiff's second amended complaint. (ECF No. 62.) Plaintiff's allegations are accepted as true for purposes of reviewing Defendant's motion to dismiss.

Plaintiff successfully bid on a project to serve as the prime contractor for the installation of the Kennebec Valley Pipeline, a natural gas pipeline project for which Defendant Summit Natural Gas of Maine, Inc. was responsible. (Sec. Am. Compl. ¶ 1, ECF No. 62.) The contract covered the installation of miles of underground pipe and several service installations for customers. (*Id.* ¶ 7.) In the bidding process, Defendant made certain representations to Plaintiff regarding the location of the line. Specifically, Plaintiff alleges that Defendant represented the pipeline would run "off the curb," which means the pipeline would not run directly beneath the roadway. Based on this representation, Plaintiff concluded that the trench would not have to run down paved streets. (*Id.* ¶ 8.)

According to Plaintiff, after Plaintiff submitted its bid, Defendant "changed the trench line location such that a significant portion of the trench line would be in the roadways." (*Id.* ¶ 9.) The changes caused Plaintiff "to incur additional costs, to perform additional Work and services that were compensable under the Contract, and caused [Plaintiff's] Work to be more difficult, expensive and time-consuming." (*Id.* ¶ 13.) Principally, the trench work under the roadway resulted in costs for hauling trenched material and replacement fill, and for a traffic control subcontractor. (*Id.* ¶ 18.)

Plaintiff notified Defendant of the additional costs and work, and continued its work on the project with the understanding that Defendant would compensate it for the increased costs and work. (*Id.* ¶ 14.) According to Plaintiff, "[t]he changes in the scope of [Plaintiff's] Work and

additional obligations and directions of [Defendant] and/or local authorities caused [Plaintiff] to incur additional costs, to perform additional Work and services that were compensable under the Contract, and caused [Plaintiff's] Work to be more difficult, expensive, and time-consuming." (*Id.* ¶ 13.)  When Plaintiff presented Defendant with a change order and supporting invoices to recoup the money expended on its additional costs, Defendant told Plaintiff that it did not intend to pay or even review the hauling and traffic control invoices, "despite the fact that [Plaintiff] met all the terms and conditions of the Contract, provided invoices, reformatted the invoices at Defendant's request a number of times and requested payment."  (*Id.* ¶¶ 15, 18, 21.)

Plaintiff filed a second amended complaint in which Plaintiff asserted two additional causes of action: a claim of fraudulent misrepresentation / fraud in the inducement (Count IV) and a claim of negligent misrepresentation (also titled Count IV).[1]  (*Id.* ¶¶ 40 – 50.)  Plaintiff alleges that Defendant misrepresented the nature of the work on the project for which Plaintiff was the successful bidder.  Plaintiff alleges that it was harmed because the work was "more difficult, expensive, and time-consuming" than anticipated and required Plaintiff to assume additional and unexpected costs.  (*Id.* ¶¶ 11, 13.)

## Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may seek dismissal of "a claim for relief in any pleading" if that party believes that the pleading fails "to state a claim upon which relief can be granted."   In its assessment of the motion, a court must "assume the truth of all well-plead facts and give the plaintiff[] the benefit of all reasonable inferences therefrom." *Blanco v. Bath Iron Works Corp.*, 802 F. Supp. 2d 215, 221 (D. Me. 2011) (quoting *Genzyme*

---

[1] In Plaintiff's second amended complaint, the two claims challenged by Defendant are both titled "Count IV."  In its motion to dismiss, Defendant labels the fraud claim "Count IV" and labels the misrepresentation claim "Count V."

3

*Corp. v. Fed. Ins. Co.,* 622 F.3d 62, 68 (1st Cir. 2010)). To overcome the motion, the plaintiff must establish that its allegations raise a plausible basis for a fact finder to conclude that the defendant is legally responsible for the claim(s) at issue. *Id.*

## Discussion[2]

Defendant argues that the economic loss doctrine requires the dismissal of Plaintiff's negligent misrepresentation claim. Defendant maintains Plaintiff cannot assert a claim for negligent misrepresentation because the parties' relationship is defined by a contract and thus Plaintiff's damages, if any, are contractually-based and are not tort-based. (Motion at 1.) More particularly, Defendant characterizes Plaintiff's claim as involving the "value and quality" of its bargain with Defendant, and argues that relevant case law precludes Plaintiff's recovery for negligent misrepresentation. (*Id.* at 8 – 12, discussing cases.) Plaintiff contends dismissal is not appropriate because the claim is not about "value and quality," but is about a "bait and switch" whereby Plaintiff was induced or required to perform work outside the scope of the contract. (Response at 4 – 6.)

### A.   Negligent Misrepresentation and the Economic Loss Doctrine

Maine law recognizes a claim for negligent misrepresentation under the following circumstances:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

---

[2] The discussion will not address the fraud claim. Plaintiff has agreed to dismiss the claim without prejudice, reserving the right to reassert the claim "depending on what may be revealed in further discovery." (Plaintiff's Response at 3, ECF No. 71.) In reply, Defendant states that it "shall stipulate to such dismissal." (Reply at 1, ECF No. 72.) Accordingly, no further discussion of the fraud claim is warranted.

*Chapman v. Rideout,* 568 A.2d 829, 830 (Me. 1990) (adopting the formulation of the tort as stated in the Restatement (Second) of Torts § 552(1) (1977)).  In the business context, a party that provides information can be liable when it "fails to exercise the care or competence of a reasonable person under like circumstances."  *Rand v. Bath Iron Works,* 2003 ME 122, ¶ 13, 832 A.2d 771, 774-75.  In Maine, the liability for misrepresentation is measured by the economic interest at stake, which is sometimes described as the "lost bargain."  *Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me. 1987) (quoting *Wildes v. Pens Unlimited Co.*, 389 A.2d 837, 841 (Me. 1978) (discussing action for "deceit")).  The measure of damages in tort for misrepresentation, therefore, is the same as the measure of damages for breach of contract.  *Williams v. Ubaldo*, 670 A.2d 913, 917 (Me. 1996) (breach of contract damages are designed to put the injured party in the position it would have been in absent breach, or the "benefit of the bargain"); *Deering Ice Cream Corp. v. Colombo, Inc.*, 598 A.2d 454, 456 (Me. 1991) (breach of contract damages generally are measured by injured party's expectation interest or the benefit of its bargain).

"The economic loss doctrine 'marks the fundamental boundary between the law of contracts, which is designed to enforce expectations created by agreement, and the law of torts, which is designed to protect citizens and their property by imposing a duty of reasonable care.'"  *Banknorth, N.A., v. BJ's Wholesale Club, Inc.*, 394 F. Supp. 2d 283, 286-87 (D. Me. 2005) (quoting *Fireman's Fund Ins. Co. v. Childs*, 52 F. Supp. 2d 139, 141 (D. Me. 1999)).

In the context of a product liability claim, the Maine Supreme Judicial Court adopted the economic loss doctrine in *Oceanside at Pine Point Condominium Owners Association v. Peachtree Doors, Inc.*  In particular, the Court held that in the absence of evidence that the product caused personal injury or property damage, the plaintiff could not maintain an action for negligence or negligent misrepresentation.  659 A.2d 267, 270 (Me. 1995).  The Court reasoned that the

plaintiff's "claims for economic damages – 'the costs of all repairs, renovation, corrections and replacements related to the Defendant's defective performance of its contract' – are properly addressed under a warranty theory." *Id*. at 271. The Law Court has not addressed whether the doctrine applies to claims other than product liability claims.

In several instances, this Court has considered whether under Maine law, the economic loss doctrine would preclude recovery in tort in other contractual situations. For instance, this Court applied the doctrine to preclude recovery in tort where parties to commercial contracts sought to recover in both tort and contract. *Maine Rubber Int'l v. Envtl. Mgmt. Grp., Inc.*, 298 F. Supp. 2d 133, 136 (D. Me. 2004) (dismissing negligent misrepresentation claim based on statements contained in an environmental report); *see also Gannett v. Pettegrow*, No. 1:03-cv-00228-JAW, 2005 WL 763276 (D. Me. Feb. 17, 2005) (adopting Magistrate Judge summary judgment recommendation[3] and dismissing negligent misrepresentation claim arising out of the construction of a custom-built yacht). In another case, the Court, after noting that states "vary widely in their understanding of the doctrine's scope," denied the defendants' request to dismiss the negligence claim of a debit card issuer for losses allegedly incurred when a third party stole card numbers from defendants' computers. *Banknorth, N.A.*, 394 F. Supp. 2d at 287 ("not immediately clear in what circumstances Maine's economic loss doctrine might extend to parties not in privity").

This Court also declined to apply the economic loss doctrine to preclude recovery in tort where customers of a grocery store sought to recover in tort and contract for damages allegedly caused by a third-party's theft of the customers' electronic payment data. While acknowledging that "in some jurisdictions, courts have applied this 'economic loss doctrine' to prevent tort

---

[3] *Gannett v. Pettegrow*, No. 1:03-cv-00228-JAW, 2005 WL 217036, at *8 (Jan. 28, 2005). The Court accepted and adopted the recommended decision in the absence of any objection. 2005 WL 763276.

recovery altogether for purely economic damages incurred by parties to a contractual relationship, unless there is also personal injury or physical property damage," the Court observed that "the doctrine started out much narrower, and the Maine Law Court has never had occasion to broaden its application. According to the Law Court's last statement on the topic in 1995, the economic loss doctrine stands for the proposition that '[c]ourts generally … do not permit tort recovery for a defective product's damage to itself.'" *In re Hannaford Bros. Co. Customer Data Security Breach Litig.*, 613 F. Supp. 2d 108, 127 (D. Me. 2009) (quoting *Oceanside*, 659 A.2d at 270).[4] Because the plaintiff's claim did not involve a defective product, the Court determined that "[f]rom the Law Court's most recent pronouncement (1995) on the economic loss doctrine, … Maine law does not give Hannaford a defense to tort recovery for negligence." *Id*. at 127 – 28.

Most recently, this Court applied the economic loss doctrine and dismissed the negligent misrepresentation counterclaim of Summit Natural Gas of Maine, Inc. (Defendant herein) against the general contractor on the Kennebec Valley Pipeline Project (Schmid Pipeline Construction, Inc.). Through its Order Affirming (ECF No. 33) the Recommended Decision (ECF No. 24) on Schmid's motion to dismiss, the Court adopted the conclusion that because the dispute between the owner and contractor concerned the "value and quality of what was purchased," dismissal of the negligent misrepresentation counterclaim was appropriate. *Schmid Pipeline Const., Inc. v. Summit Nat. Gas of Maine, Inc.*, No. 1:13-cv-00464-GZS, 2014 WL 3600437, at *4 (D. Me. July 22, 2014). In that case, the dispute specifically involved "the consequences of Schmid's purported failure to perform under the terms of the parties' contract." *Id.*

---

[4] On appeal, the First Circuit Court of Appeals affirmed in part and reversed in part, without addressing the merits of the Court's discussion of the economic loss doctrine. *Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 153 (1st Cir. 2011).

As in *Schmid*, a review of the pleadings and the attached contract reveals that the parties, two commercial entities, negotiated a contract that is the subject of the parties' dispute; that Plaintiff does not allege a special relationship between the parties that would generate an independent duty in tort; and that Plaintiff's claim is one that seeks the "value and quality" of the purchase (i.e., the work performed).  In other words, the gravamen of Plaintiff's claim is that in consideration for monetary payments, Plaintiff agreed to perform certain work for Defendant, that the work was compensable under the parties' agreement,[5] and that despite the fact that Plaintiff performed the work in accordance with the agreement, Defendant has failed to pay Plaintiff for the value of the work performed.  Plaintiff's claim, therefore, is a contractual claim and within the scope of the economic loss doctrine.[6]

---

[5]  As alleged by Plaintiff:
> 13. The changes in the scope of Tetra Tech's Work and additional obligations and directions of Summit and/or local authorities caused Tetra Tech to incur additional costs, to perform additional Work and services *that were compensable under the Contract*, and caused Tetra Tech's Work to be more difficult, expensive, and time-consuming.

(Sec. Am. Compl. ¶ 13) (emphasis supplied.)

[6]  As noted in *Schmid*, dismissal was appropriate regardless of whether the Court determined that under the circumstances the defendant did not owe a duty in tort, or whether the Court applied the economic loss doctrine.  The same is true here.  To the extent that the Court applied the economic loss doctrine, if the recommendation is adopted, the Court's decision would be consistent with the Law Court's reasoning in *Oceanside*, 659 A.2d at 271 (holding that "claims for economic damages … are properly addressed under a warranty theory"), and this Court's analysis in *Banknorth*, 394 F. Supp. 2d at 287 (reasoning that application of the economic loss doctrine is dependent upon the nature of the parties' relationship), and *Maine Rubber International*, 298 F. Supp. 2d at 137 – 138 (explaining that "the logic of [*Oceanside*] encompasses the relationship here [professional services agreement]" where the "critical issue … is value and quality of what was purchased").  While the result in *In Re Hannaford* may appear to be inconsistent with this recommendation, it is noteworthy that the Court did not repudiate its decision in *Maine Rubber International* and insofar as *In Re Hannaford* did not involve parties to a bargained-for commercial contract, but rather a series of consumer transactions conducted in the absence of any written contract, the result is understandable and the case is distinguishable and not inconsistent with the above reasoning.

Subsequent to *Schmid*, the Court has declined to extend the economic loss doctrine to a negligence claim and a fraud claim.  The Court's rationale in each case is consistent with the recommendation herein.  *See C & M Prop. Mgmt., LLC v. Moark, LLC*, No. 2:15-cv-00336-GZS, 2016 WL 1298098, at *4 (D. Me. Mar. 31, 2016) (denying motion to dismiss negligence claim that was "based on Defendant's alleged duty to maintain safe premises [rather than] the value and quality of goods or services over which the parties bargained"); *Workgroup Tech. Partners, Inc. v. Anthem, Inc.*, No. 2:15-cv-00002-JAW, 2016 WL 424960, at *19 (D. Me. Feb. 3, 2016) (denying motion to dismiss fraud claim where the plaintiff alleged that the defendant hired experts to steal the plaintiff's work product).  The Court also has applied the economic loss doctrine to a fraud claim involving alleged misrepresentations concerning the quality of a product sold to the plaintiff.  *Am. Aerial Servs., Inc. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 111 (D. Me. 2014).

**Conclusion**

Based on the foregoing analysis, because Plaintiff has agreed to dismiss voluntarily its fraud claim, and because the economic loss doctrine bars Plaintiff's claim for negligent misrepresentation, I recommend the Court grant the Motion to Dismiss (ECF No. 63).

**NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison  
U.S. Magistrate Judge

Dated this 13th day of July, 2016.